## COCKERLINE MEMORIAL FUND, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11813-83.    Filed January 21, 1986.

*Dennis D. Ashenfelter*, for the petitioner.
*Janine L. Hook*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined that the petitioner was liable for the excise taxes on certain private foundations under section 4945(a)(1) of the Internal Revenue Code of 1954[1] in the amounts of $2,823 for 1977, $3,425 for 1978, and $2,498 for 1979. The issues for decision are: (1) Whether, during the years 1977 through 1979, the petitioner, which has a program of granting scholarships to Oregon students who attend Oregon colleges, was a supporting organization within the meaning of section 509(a)(3), and (2) if, during such years, the petitioner was not a supporting organization, whether the Commissioner's refusal to grant retroactive approval, under section 4945(g), of its grant-making procedures was an abuse of discretion.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Cockerline Memorial Fund, maintained its legal residence in Albany, Oregon, at the time of filing its petition. It filed its returns as a private foundation exempt from income tax for its taxable years ending June 30, 1977, and June 30, 1978, with the Internal Revenue Service, Philadelphia, Pennsylvania, and for its taxable year ending June 30, 1979, with the Internal Revenue Service Center, Ogden, Utah. We shall refer to a taxable year by the calendar year in which it ends.

The petitioner, a testamentary trust, was created under the will of Mrs. Lois E. Cooley in 1968. Her will directed that the income from the trust should be used to:

provid[e] young people of the State of Oregon with funds to attend college and maintain themselves while attending college. It is my desire

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.

and request that in expending such fund and selecting persons to become the beneficiaries of such memorial fund, that the trustees give particular preference to students attending the Northwest [Christian] College at Eugene, Oregon, but shall be entirely free to use any portion of said income for the benefit of deserving young people who wish to attend other institutions of learning in the State of Oregon, * * *

Northwest Christian College (Northwest) is a private college closely related to churches variously known as the Disciples of Christ or the Christian Church. Full-time student enrollment at Northwest for the relevant years was: 1977, 431; 1978, 332; and 1979, 291.

Mrs. Cooley's will provides that the petitioner is to be managed by a board of trustees consisting of seven members. The president of Northwest is ex officio one of the members, and the manager of the Albany Branch of the United States National Bank of Portland (Oregon) is ex officio another member of the board. The remaining five members of the board were named in the will, and vacancies in such positions are to be filled by a vote of the other members. Each member of the board of trustees has an equal vote in the board's affairs. No board member, other than the president of Northwest, is required to be associated with any college or university. However, at the time of trial, each board member was a member of a church which supported Northwest and which was frequently visited by the president of Northwest.

The petitioner's board of trustees has total control over and responsibility for the petitioner's affairs. As stated in article III of the petitioner's bylaws:

*Powers of Trustees*: The Board of Trustees shall have the entire management of the trust estate and shall exercise the management and control of the property, business and affairs of the trust and is vested with all of the powers possessed by the trust estate itself so far as this delegation of authority is not inconsistent with the laws of the State of Oregon, the trust instrument or with these ByLaws.

In addition, Mrs. Cooley's will specifically authorizes the board of trustees to "invest and reinvest" the petitioner's assets.

A majority of the members of the board of trustees of the petitioner constitutes a quorum. A majority vote, when a

quorum is present, is required for the normal transaction of business.

A five-member scholarship committee selects, subject to approval by the board of trustees, recipients of grants from the scholarship applicants. The board has rarely, if ever, selected a recipient not recommended by the committee. No member of the board of trustees is a member of the committee. Committee members are nominated by the president and the financial aid officer of Northwest. At the time of trial, the financial aid officer and academic dean at Northwest were members of the scholarship committee, and it was customary for the committee to include such officials of Northwest and other persons interested in Northwest.

The scholarship committee meets at and operates out of Northwest. It receives applications, reviews application material, and ranks the applicants according to financial need and grade point average. All successful applicants must be residents of Oregon and accepted at a college or university in Oregon. The maximum total score for an applicant based on financial need and grade point average is 8, and scholarships are awarded on the basis of the highest scores. During the years at issue, students at Northwest were given a bonus of .25, but in the 1979–80 academic year, that bonus was increased to 2.00.

The petitioner's grant-making activities have not changed, and no funds have been retained or diverted for any improper purpose. Scholarship grants are paid directly to colleges and universities in Oregon, and all of the petitioner's income is distributed annually to these institutions. Grants are paid on behalf of a selected student and must be returned if the student fails to enroll full-time, or if the student does not maintain the required grade point average of 2.50.

During the years in issue, Northwest received an average of two-thirds of the grants made by the petitioner. During the prior 3 years, it received an average of three-quarters of such grants. At the time of trial, Northwest received over 90 percent of the funds dispensed by the petitioner.

Annually, an average of 9 percent of Northwest's full-time students were awarded grants by the petitioner during the years at issue. The grants by the petitioner amounted to an

average of 8 percent of Northwest's total financial aid for students, including Government grants and loans, and 55 percent of the reoccurring endowed funds available each year at Northwest. Endowed funds arise where, as here, there is an income-producing trust and only the income is distributed. Endowed funds are viewed very favorably by Northwest because there is greater certainty that the funds will be available in future years than with unendowed sources. At the time of trial, over 20 percent of the students at Northwest received grants from the petitioner. The grants for students attending other Oregon colleges or universities did not represent a significant portion of the student financial aid received by any of such colleges or universities.

The parties agree that the petitioner is an organization described in section 501(c)(3) and that it is exempt from the income tax. In 1970, the Commissioner determined that the petitioner was a private foundation. Years later, during a routine audit, it was determined that the petitioner had not requested advance approval of its grant-making procedures, as required of private foundations under section 4945(g). In 1979, the petitioner filed a request for the approval of such procedures, and in 1980, the Commissioner approved the request, retroactive to November 30, 1979. In 1983, the Commissioner issued a notice of deficiency determining the deficiencies at issue.

OPINION

Section 4945 imposes certain excise taxes on grants made to individuals by private foundations, unless the Commissioner has given his prior approval of the program for the grants in accordance with section 4945(g). The first issue for decision in this case is whether the petitioner is a private foundation and subject to such excise taxes.

Under section 509(a), all organizations described in section 501(c)(3) are private foundations except those excluded under section 509(a)(1) through (4). Excepted organizations include, inter alia, educational institutions and foundations which receive substantial public financial support. Sec. 509(a)(1) and (2). These organizations are referred to as publicly supported organizations. Sec. 1.509(a)-4(a)(5), In-

come Tax Regs. Additionally, organizations which are organized and operated to support publicly supported organizations are excepted from private foundation status. Sec. 509(a)(3). Such organizations are described as supporting organizations. Sec. 1.509(a)–4(a)(5), Income Tax Regs. Organizations that are organized and operated exclusively for testing for public safety are also excepted. Sec. 509(a)(4).

The petitioner is a section 501(c)(3) organization and, thus, presumptively a private foundation. Sec. 508(b). The petitioner claims that it is excluded from private foundation status because, during the years in issue, it was a supporting organization within the meaning of section 509(a)(3). Section 509(a)(3) provides that a supporting organization is:

> an organization which—
> (A) is organized, and at all times thereafter is operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more * * * [publicly supported organizations],
> (B) is operated, supervised, or controlled by or in connection with one or more * * * [publicly supported organizations]; and
> (C) is not controlled directly or indirectly by one or more disqualified persons * * * other than foundation managers and other than one or more * * * [publicly supported organizations] * * *

The Commissioner concedes that the petitioner is not controlled by a disqualified person within the meaning of section 509(a)(3)(C). Except as to such concessions, the petitioner has the burden of proving that the Commissioner's determination of private foundation status was incorrect. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933). Thus, in order to prevail, the petitioner must establish that it satisfies the requirements of section 509(a)(3)(A) and (B). Because the nature of the qualifying relationships between the supporting and publicly supported organizations under section 509(a)(3)(B) may determine the applicable criteria under section 509(a)(3)(A), we first consider section 509(a)(3)(B).

Section 509(a)(3)(B) describes the nature and quality of the relationship that must exist between the supporting organization and the publicly supported organization. Section 1.509(a)–4(f) of the Income Tax Regs. further describes and defines the required relationships. A supporting organi-

zation may be "operated, supervised, or controlled by" one or more publicly supported organizations. Sec. 1.509(a)–4(f)(2)(i), Income Tax Regs. In such a situation, the relationship required is comparable to that of a parent and subsidiary, where the supporting organization is under the direction of, and accountable to, the publicly supported organization. Sec. 1.509(a)–4(g). In the alternative, the supporting organization may be "supervised or controlled in connection with" one or more publicly supported organizations. Sec. 1.509(a)–4(f)(2)(ii). In such a situation, the supporting and publicly supported organizations are compared to brother and sister organizations subject to common control. Sec. 1.509(a)–4(h). Finally, the supporting organization may be "operated in connection with" one or more publicly supported organizations. Sec. 1.509(a)–4(f)(2)(iii). In this situation, neither organization controls the other and no third party controls both organizations, but there exist sufficient ties between the organizations to meet the requirements for supporting organization status. Sec. 1.509(a)–4(i).

The petitioner contends that it is a supporting organization since it is "operated in connection with" the colleges and universities in Oregon. Sec. 1.509(a)–4(f)(2)(iii). In order for the relationship to exist, the petitioner must satisfy the requirements of the responsiveness and the integral part tests of section 1.509(a)–4(i) of the regulations.

The responsiveness test is designed to insure that the publicly supported organization will have the ability to influence the activities of the supporting organization. The responsiveness test requirements are set forth in section 1.509(a)–4(i)(2), Income Tax Regs. The relevant requirements, under the facts of this case, are found in subdivisions (b) and (d) of section 1.509(a)–4(i)(2)(ii). Under subdivision (b), at least one member of the governing body of a publicly supported organization must hold an important office in the supporting organization, such as a seat on the board of trustees. Subdivision (d) requires that the relationship between the organizations insures that the publicly supported organizations:

have a significant voice in the investment policies of the supporting organization, the timing of grants, the manner of making them, and the

selection of recipients by such supporting organization, and in otherwise directing the use of the income or assets of such supporting organization.

We hold that the petitioner satisfies the requirements of the responsiveness test. The president of Northwest is, by virtue of his office, a member of the board of trustees of Northwest and the board of trustees of the petitioner. Therefore, there is a common member of the governing bodies of both organizations, as required by subdivision (b) of the responsiveness test.

The Commissioner contends that because the president of Northwest holds only one of seven seats on the petitioner's board of directors, no publicly supported organization "controls" the activities of the petitioner and that, therefore, the petitioner does not meet the requirements of subdivision (d) of the responsiveness test. The plain language of the regulation undermines the Commissioner's argument. The regulation requires one or more publicly supported organizations to have a "significant voice" in the activities of the supporting organization. The word "significant" means "likely to have influence," not control. Webster's Third New International Dictionary 2116 (1981). Additionally, the regulations make it clear that the "operated in connection with" relationship does not require control of the supporting organization by any publicly supported organization. Sec. 1.509(a)-4(i), Income Tax Regs.

As stated in the petitioner's constitution and bylaws, the board of trustees has complete power over all facets of the petitioner's activities, including investment decisions and selection of the grant recipients. No provision is made for the exercise of power by any other group, other than those authorized by the board of trustees. The broad scope of authority given the board of trustees assures that the president of Northwest had the opportunity to exercise a significant voice in the affairs of the petitioner.

The facts indicate that Northwest did exercise a significant voice in the petitioner's affairs. Through the president's position on the petitioner's board of trustees, Northwest was able to participate in the decision-making process with regard to such important subjects as investments and scholarship recipient selection. Additionally, the evidence shows that Northwest dominated the scholarship commit-

tee. Indeed, as vacancies occurred, the president of Northwest and Northwest's financial aid officer, who was on the committee, proposed replacement members for approval by the board of trustees. The committee's meetings were held on the Northwest campus. Finally, for the years in issue, Northwest received an average of two-thirds of the funds distributed by the petitioner, and in later years, it received 90 percent of the petitioner's distributions.

The integral part test is described in depth in section 1.509(a)–4(i)(3), Income Tax Regs. It is designed to insure that the publicly supported organization will be attentive to the supporting organization, thereby acting to curb any abuses by the supporting organization of its reasons for tax exemption. The test requires that the supporting organization maintain a substantial involvement in the operations of the publicly supported organization by either performing an essential function for, or paying a substantial amount of money to, one or more publicly supported organizations. Sec. 1.509(a)–4(i)(3)(ii) and (iii). The record shows that the petitioner satisfies the requirements of the integral part test under section 1.509(a)–4(i)(3)(iii). The regulation requires that the supporting organization pay substantially all of its funds to publicly supported organizations and that the amount paid to at least one publicly supported organization be sufficient to insure the attentiveness of such publicly supported organization to the supporting organization's activities. The determination as to attentiveness should be made by reference to all the circumstances surrounding the relationship between the organizations, including "evidence of actual attentiveness" by the publicly supported organization. Sec. 1.509(a)–4(i)(3)(iii)(d).

At all relevant times, the petitioner paid substantially all of its income to colleges and universities in Oregon. Because these are publicly supported institutions, the first requirement is satisfied. Therefore, the petitioner must show only that the amount of funds paid was sufficient to insure the attentiveness of a publicly supported organization.

Taking into account all of the circumstances surrounding the relationship between the petitioner and Northwest, including the amount of funds distributed, the number of students affected, and the history and nature of the

relationship, we find the requisite attentiveness on the part of Northwest. The funds paid to Northwest from the petitioner constituted an average of 8 percent of the scholarship funds at Northwest and affected 9 percent of the full-time students at Northwest. The president of Northwest testified that a reduction in funds from the petitioner would cause Northwest to expend efforts to obtain offsetting funds elsewhere. Additionally, the near-decade-long relationship between the petitioner and Northwest, together with the petitioner's reliance upon the Northwest-nominated scholarship committee, points to continuing attentiveness by Northwest to the operations of the petitioner. Finally, we believe that the Commissioner recognized the importance of the petitioner's funds to Northwest when the Commissioner stated in his brief that "a small private college such as Northwest would be understandably reluctant to lose the support of the petitioner's endowment."

Here, as under the responsiveness test, the Commissioner argues that the petitioner does not meet the criteria of the regulations because Northwest does not control the petitioner. The argument is erroneous because the integral part test focuses attention on the motivation of a publicly supported organization to be attentive to the supporting organization's activities. Control by the publicly supported organization is not required by the integral part test.

The purpose requirement, as set forth in section 509(a)(3)(A), requires that a supporting organization be organized and operated "exclusively" to support one or more "specified" publicly supported organizations. Paragraphs (c), (d), and (e) of section 1.509(a)–4, Income Tax Regs., describe the organizational and operational tests of section 509(a)(3)(A).

The elements of the organizational test are set forth in detail in section 1.509(a)–4(c). This regulation requires that the articles of organization of the supporting organization, in this case Mrs. Cooley's will, limit the purposes of the organization to supporting one or more publicly supported organizations and "specify" the organization to be benefited. No particular language is needed to satisfy the

requirements. *Goodspeed Scholarship Fund v. Commissioner*, 70 T.C. 515, 524 (1978).

The relevant passage from the will of Mrs. Cooley states that the petitioner's funds are to be distributed "for the purpose of providing young people of the State of Oregon with funds to attend college." The colleges and universities in the State of Oregon are publicly supported organizations. However, the Commissioner maintains that because the petitioner substantially benefits students, who are not publicly supported organizations, the petitioner is not organized exclusively for the benefit of a publicly supported organization. This argument is directly contradicted by example (*1*) of section 1.509(a)–4(d)(2)(iii), Income Tax Regs., and we find it meritless. See *Nellie Callahan Scholarship Fund v. Commissioner*, 73 T.C. 626, 635–636 (1980).

Section 509(a)(3)(A) requires that the publicly supported organization be "specified." Paragraphs (g) and (h) of section 1.509(a)–4, Income Tax Regs., provide that supported organizations may be designated by class or purpose when the relationship between the publicly supported and supporting organizations is that of parent-subsidiary or brother-sister organizations. However, paragraph (d)(2)(i) of section 1.509(a)–4 takes the position that where the supporting organization is operated "in connection with" the publicly supported organization, as is the case here, the supported organization must be designated by name. An exception is made to such requirement by paragraph (d)(2)(iv) of section 1.509(a)–4, which states that the publicly supported organization will be sufficiently specified, even though not named in the supporting organization's articles, when there has been a "historic and continuing relationship" between the organizations and a "substantial identity of interests" between such organizations has resulted.

The petitioner contends that the required naming of the publicly supported organization where the supporting organization is operated "in connection with" the publicly supported organization, while allowing all other supporting organizations to identify the publicly supported organizations by class or purpose, is invalid because neither subparagraph (A) nor (B) of section 509(a)(3) draw such a distinction. However, we need not and do not pass on such

contention since we are convinced that the petitioner satisfies the historic and continuing relationship exception described in section 1.509(a)–4(d)(2)(iv), Income Tax Regs. No specific time period is required to establish a historic and continuing relationship between the supporting and the publicly supported organizations. The existence of the relationship and the identity of interest between the organizations must be determined from the circumstances surrounding the interaction of the organizations. *Change-All Souls Housing Corp. v. United States*, 671 F.2d 463, 471–472 (Ct. Cl. 1982). Additionally, the requirements must be applied consistent with the stated legislative goal of not unduly interfering with supporting organizations which aid educational institutions. S. Rept. 91–552 (1969), 1969–3 C.B. 423, 462; H. Rept. 91–782 (Conf.) (1969), 1969–3 C.B. 644, 651.

The petitioner has maintained the historic and continuing relationship with the colleges and universities in Oregon. Since its inception in 1968, the petitioner, in accordance with Mrs. Cooley's will, has distributed all of its funds directly to colleges and universities in Oregon. Such funds were returned to the petitioner if the student upon whose behalf the funds were provided failed to enroll full-time or if the required 2.50 grade point average was not maintained. The petitioner has established a scholarship committee to recommend worthy students attending colleges or universities in Oregon. Additionally, the petitioner and Northwest, one member of the class of publicly supported organizations, have established a particularly close working relationship. Finally, we observe that both the petitioner and the colleges and universities in Oregon have as their ultimate goal the education of students in Oregon. These facts establish the type of relationship and the "substantial identity of interests" needed to determine that the petitioner is organized to benefit identifiable publicly supported organizations, thereby avoiding abuses which might arise where the beneficiaries are not identified in the articles of the supporting organization.

The Commissioner's final objection is that to qualify the petitioner as a supporting organization would be inconsis-

tent with the congressional intent associated with the adoption of section 509. We disagree.

Private foundations were defined and subjected to extensive regulation by the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487. The act was intended to combat the perceived abuse of tax exempt status where there is self-dealing between substantial contributors and their foundations, failure to distribute foundation income to charities, foundation ownership and control of private businesses, speculative investment of foundation funds, and the use of foundation money for programs or activities not within the scope of the tax exemption provisions. H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 213–228; S. Rept. 91–552, *supra*, 1969–3 C.B. at 440–464; H. Rept. 91–782, *supra*, 1969–3 C.B. at 644–651. The act imposes a series of excise taxes on private foundations. Secs. 4940 through 4945. Public charities are exempt from private foundation treatment and, consequently, the excise taxes, on the theory that public scrutiny arising from a foundation's dependence upon public funds will prevent abusive acts by the foundation. Supporting organizations are similarly excepted on the theory that scrutiny by the publicly supported organizations will prevent abuse by the supporting organization. *Quarrie Charitable Fund v. Commissioner*, 70 T.C. 182, 190 (1978), affd. 603 F.2d 1274 (7th Cir. 1979). The belief that scrutiny by a publicly supported organization, under the appropriate circumstances, is sufficient to guard against abuse by the supporting organization is embodied in section 509(a)(3). The provisions of that section are designed to insure that a supported organization has the ability and motivation to properly oversee the activities of the supporting organization. The close and continuous relationship between the petitioner and Northwest was of this type. It produced the type of close scrutiny which renders unlikely the congressionally feared abuses. In fact, as the Commissioner agrees, no such abuses have occurred.

In conclusion, we hold that the petitioner was a supporting organization within the meaning of section 509(a)(3) during the years in issue. As a supporting organization, the petitioner is not subject to the excise tax under section 4945(a)(1). Because we hold for the petitioner on this issue,

we need not address the second issue raised by the petitioner.

*Decision will be entered for the petitioner.*