NATIONAL FOUNDATION, INC., Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 346–85T.

United States Claims Court.

Oct. 30, 1987.

As Amended Nov. 10, 1987.

---

Paul H. Chappell, Chevy Chase, Maryland, for plaintiff. Gammon & Grange, Washington, D.C., of counsel.

W.C. Rapp, Dept. of Justice, Washington, D.C., for defendant.

## OPINION

ROBINSON, Judge.

In this action, plaintiff National Foundation, Inc., ("NFI") seeks a declaratory judgment under 26 U.S.C. § 7428, as amended, that it is a tax-exempt organization pursuant to § 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. § 501(c)(3)). The case concerns the initial qualification of the plaintiff as an exempt organization and is premised upon the failure of the Commissioner of Internal Revenue Service to approve NFI's Application for Recognition as a tax exempt organization. The Administrative Record ("AR") in this case was submitted to the Court on March 7, 1986, pursuant to stipulation of the parties.

This action raises two issues: (1) whether NFI is organized and operated for exempt purposes within the meaning of § 501(c)(3), and (2) whether any part of NFI's earnings inure to the benefit of private individuals contrary to § 501(c)(3).

For the reasons assigned in this Opinion, the Court finds that NFI is organized and operated for exempt purposes and that no part of NFI's earnings inure to the benefit of private individuals contrary to § 501(c)(3). Therefore, NFI is a tax exempt organization under § 501(c)(3).

### Facts

NFI is a Maryland nonstock, nonprofit corporation created on April 8, 1983. Its articles of incorporation state that it is organized exclusively for charitable, religious, educational, literary, and scientific purposes in accordance with 26 U.S.C. § 501(c)(3) and that no part of its net earnings shall inure or be distributed to its members, officers, or other private persons, except to pay for services rendered and to distribute funds for exempt purposes. In its application for exemption, NFI stated essentially two major purposes: (1) to raise and distribute funds to other nonprofit organizations; and (2) to initiate, fund, and administer a wide variety of charitable, educational, religious, scientific, and literary projects, most of which are recommended by donors. AR 8–10. NFI administers approximately 695 pending projects. Of the total amount disbursed in 1983, approximately 42 per cent was contributed directly to other § 501(c)(3) organizations in accordance with its first stated purpose. The balance of the donated funds (58 per cent) was disbursed to support projects that further NFI's exempt purposes; i.e., operating projects.

A charitable project or account may be established by any interested party completing and submitting to NFI a project proposal application. The application form is signed by the person proposing the project, often a prospective donor. AR 101. The applicant pays a nonrefundable $100 application fee and a minimum initial contribution of $500 which is designated to the project if it is approved, less fundraising and administrative costs of 8½ per cent. After NFI's executive director reviews and tentatively accepts a proposed project, the board of directors or appropriate board committee evaluates the project

and must be convinced that the project will render a substantial public benefit. AR 102. The NFI board reserves sole discretion to approve or disapprove any application or proposal for a new project.

NFI states that the basic requirements in evaluating a proposed project or a request for disbursement are: (1) the project must clearly be of a type described in § 501(c)(3) of the Internal Revenue Code; (2) the project or disbursement must serve a public purpose and must not result in private gain or inurement to any individual; (3) each project application or request for disbursement must be supported by adequate documentation; (4) the scope of the project must be adequately described on a statement of proposed financial activity; (5) if the requested donee is an organization, there must be proof that the organization is a qualified tax-exempt entity; and (6) the board must determine that it can effectively administer the project given its proposed scope, level of activities, geographic location, and other factors.

If the board rejects a proposed project, the donor's initial $500 contribution is refundable, or, at the donor's request, may be donated to a qualified charity or relinquished to NFI as an undesignated contribution. While the project is under evaluation, the contributed funds are accounted for as escrow or custodial funds, and if returned because the project was rejected, the donor is notified that he has made no contribution other than the nonrefundable $100 application fee. AR 109. However, once a donor commits his funds either for use in a project or for general charitable use, NFI retains full control, ownership and discretion, and is not obligated to use the funds in the manner requested. AR 309. Donors are apprised of this in the application form they submit, which states that "to qualify as a deductible contribution for income tax purposes, the ownership and custody of the donated funds and property must be fully relinquished to National Foundation, Inc." Although the donor may request that his funds be used for a certain charitable project, the donor has no legal recourse in the event he believes that his charitable wishes are not being fulfilled, since funds donated to NFI are given without restriction. If a donor becomes dissatisfied with NFI's use of the funds or supervision of a project, however, the donor may request that the unspent balance in the project account be directed to another qualified § 501(c)(3) organization. AR 104. NFI's policies provide that recommendations made by donors for specific disbursements will ordinarily be honored provided that the requests are consistent with the stated purposes of the project, IRS requirements, and NFI policies.

NFI is brought into contact with donors through Charitable Development Officers (CDOs), who are typically professionals such as accountants, attorneys, trust officers, stockbrokers, life underwriters, ministers and CDOs for universities, hospitals, and churches. CDOs recommend to NFI potential donors whom they presumably meet in the course of their occupation. Their duties include soliciting clients for NFI, providing prospective donors with NFI's policy manual, and screening donors to ensure good reputation and character. AR 74–75. Under the agreement between NFI and the CDOs, none of the CDOs serves as a director or officer of NFI. The agreement also provides that CDOs shall not give legal advice, tax advice, or financial planning advice to donors on behalf of NFI. AR 70. As compensation for soliciting donors, CDOs are paid a percentage, ranging from three to six per cent, of the donations they generate. The percentage paid varies with the value of the donation. In addition, CDOs receive $50 of every $100 application fee generated through their efforts, whether the application is accepted or not.

Each project account reflects disbursements in the amount of the contribution and deposits of funds that have been designated for that project. AR 105. Because each account is considered a distinct charitable project, NFI maintains segregated internal accounting to reflect the project account's contribution and disbursement activity. AR 298. However, these sub-accounts are simply a method of detailed record keeping designed to track the activi-

ties of each project. The sub-accounts do not represent separate funds or separate legal entities. NFI is the only legal entity. NFI maintains only a single fund in which all of its assets are combined and invested and from which expenditures are made. AR 451.

NFI paid compensation to individuals for services rendered in 44 of the 695 projects that were pending in February 1984. In these cases, compensation was determined to be reasonable under the circumstances. A person proposing a project will not routinely be compensated. In some cases, however, where: (1) the person is appropriately qualified; (2) the proposed compensation is contained in the statement of financial activity; and, (3) the proposed compensation is reasonable in view of the type of service to be rendered, its need, the qualifications of the person selected to render the service, the prevailing value of comparable services, and extent and expertise of the services proposed, the board may authorize compensation as an expense item. AR 447.

On June 23, 1983, NFI applied to the Baltimore District Director's Office of the Internal Revenue Service ("IRS") for recognition of exemption from federal income tax under § 501(c)(3). AR 1–2. NFI supplemented its application with additional information requested by the IRS, AR–60–297, and on December 2, 1983, the IRS notified NFI that its exemption application was submitted to the national IRS office for a ruling. AR 88. On September 5, 1984, the IRS sent NFI a proposed ruling that denied NFI tax-exempt status under § 501(c)(3). AR–298–307. The ruling offered NFI an opportunity to protest, and NFI submitted a protest on October 24, 1984. AR 308, 443. After a conference on December 5, 1984, NFI submitted additional information to the IRS on January 15, 1985, regarding NFI's possible classification as a private foundation. AR 446. NFI and the IRS did not correspond or exchange information again after January 15, and the IRS did not issue a final ruling on NFI's tax-exempt status. On June 7, 1985, NFI filed its complaint seeking a declaratory judgment under 26 U.S.C. § 7428.

Section 7428(b)(2) requires that an organization seeking tax-exempt status under § 501(c)(3) exhaust the administrative remedies available to it within the IRS. An organization "shall be deemed to have exhausted its administrative remedies with respect to a failure by the Secretary to make a determination [on tax-exempt status] at the expiration of 270 days after the date on which the request for such determination was made if the organization has taken, in a timely manner, all reasonable steps to secure such determination." 26 U.S.C. § 7428(b)(2) (1982). When NFI filed in this court on June 7, 1985, more than 700 days had passed since NFI had applied to the IRS for tax-exempt status. NFI states that it has exhausted all of its administrative remedies. At this stage the defendant has elected not to dispute this issue or the availability of NFI's remedy under § 7428.

## Discussion
### NFI's Status Under § 501(c)(3)

NFI asserts that it is organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes and that no part of its net earnings inure to the benefit of any private shareholder or individual as prescribed by § 501(c)(3) of the Internal Revenue Code. The defendant contends NFI is an association of independent individuals and organizations for which NFI performs commercial services in return for a fee, and as such, NFI has no exempt purpose or activities itself. Further, the defendant argues that NFI's method of paying CDOs on a commission or or contingency fee basis necessarily results in inurement to private individuals. Thus, it contends NFI is not being operated for exempt purposes.

The first issue is whether NFI is organized and operated for exempt purposes.

Section 501(c)(3) and its implementing regulations set forth the criteria that an organization must satisfy to qualify for tax-exempt status, and thus for contributions made to it to be deductible from contributors' income tax under 26 U.S.C. § 170. Section 501(a) provides:

An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

Section 501(c)(3) provides:

Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provisions of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

A foundation must meet both the organizational and operational tests described in the regulations. The organizational test provides in general that an organization is organized exclusively for exempt purposes if its articles of incorporation limit it to exempt purposes and do not expressly empower it to engage, other than as an insubstantial part, in activities that do not further exempt purposes. *See* Treas.Reg. § 1.501(c)(3)–1a), (c).

█ NFI clearly passes the organizational test; its articles of incorporation repeat essentially verbatim the language of § 501(c)(3). AR 17–21. Defendant does not dispute this point but rather focuses its argument in brief on operational factors, specifically that NFI is not operated exclusively for exempt purposes.

█ An organization is "operated exclusively" for exempt purposes if it is engaged primarily in activities which accomplish one or more purposes described in § 501(c)(3). Treas.Reg. § 1.501(c)(3)–

1(c)(1); *Dumaine Farms v. Commissioner*, 73 T.C. 650, 662–63 (1980). If more than an insubstantial part of its activities is not in furtherance of an exempt purpose, an organization will not be regarded as "operated exclusively" for exempt purposes. *Better Business Bureau v. United States*, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67 (1945). Further, the organization must serve a public rather than a private interest. That is, the organization must establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by private interests. Treas.Reg. § 1.501(c)(3)–1(d)(ii). Plaintiff clearly has the burden of proving that it operates for exempt purposes. *Church of the Visible Intelligence that Governs the Universe v. United States*, 4 Cl.Ct. 55, 60 (1983). However, the Court "should not insist on such a high standard of proof that only an established organization could qualify [as a § 501(c)(3) entity]." *Id.* at 62. Thus, whether NFI meets the operational test requires careful, yet tempered, analysis.

It is defendant's position that NFI accomplishes *no* charitable goal, but instead acts as a device to permit its associated "foundation clients" first, to avoid Internal Revenue Service scrutiny of individual activities, and, second, to escape from classification as a private foundation, with the attendant restrictions and supervision. Defendant characterizes NFI as a mere commercial enterprise which provides service to a collection of clients and accordingly performs no exempt activities. In support of its position, defendant argues that plaintiff's activities are all originated, funded, and controlled by small related groups, by single individuals, or by families. Defendant contends that while donors may part with the legal title to funds transferred to NFI, these individual donors retain full control of the funds. Defendant also asserts that NFI's "fee arrangement" whereby NFI collects as much as 2½ per cent of a contribution for administrative costs clearly proves that NFI is "actually a fed-

eration of individual clients serviced by a central organization." Finally, defendant avers that NFI's foundation accounts are not themselves recognized charitable activities and thus, NFI serves only private interests by permitting donors to circumvent the deduction provision of § 170.

Defendant's contentions are serious charges, which, if supported, warrant the denial of NFI's claim for tax-exempt status. It is only as a matter of legislative grace that Congress grants exemption from federal taxes on such terms and with such conditions as it deems most appropriate for the common good. There are organizations which abuse their tax-exempt status and the integrity of the tax system requires vigilance against them. *Church of the Invisible Intelligence that Governs the Universe v. United States, supra* at 62. Yet, the Court finds that the defendant has virtually "ignored the overall picture presented by the administrative record," *Dumaine Farms v. Commissioner, supra* at 664, even though the defendant has many times reminded the Court that this Court's review is limited to the material submitted to the Commissioner which is contained in the stipulated administrative record.

■ Defendant's caricature of NFI as a commercial enterprise with no exempt purpose itself is wholly unsupported by the record. Defendant has cited no information in the administrative record that indicates that NFI is a for-profit business that engages in commercial activities. There is not a scintilla of evidence in the record that NFI renders financial, tax, or legal advice to its donors or has any intention of doing so. However, the record is absolutely clear that NFI does operate to raise and distribute funds to other non-profit organizations. In arguing that NFI has *no* exempt purpose, defendant has completely disregarded the well-documented fact that NFI donates a substantial portion of its contributions (42 per cent in 1983) to other qualified organizations exempt under § 501(c)(3), including the American Cancer Society, American Heart Association, National Mental Health Association, Edward Noble Hos-

pital of New York City, and Princeton Theological Seminary. NFI's grants to such exempt organizations are valid as an exempt purpose under the operational test. The Internal Revenue Service has ruled that a non-profit organization that provides financial assistance to tax-exempt charitable organizations is itself exempt under § 501(c)(3). Rev.Rul. 67–149, 1967–1 C.B. 133. In making gifts to other non-profit tax-exempt organizations, NFI's function is similar to that of the United Way, the Red Cross, and the Legal Services Corporation, which support and administer a wide variety of charitable, educational, religious, or other exempt projects which benefit distinct segments of the population in various geographical locations. *See*, Rev.Rul. 72–559, 1972–2 C.B. 247. NFI's operations are similarly unrestricted geographically.

■ NFI also operates to initiate, fund, and administer a wide variety of charitable, educational, religious, scientific, or literary projects. Many of these projects are recommended to NFI by its donors. The NFI Board of Directors will refuse to initiate a project unless the project meets five stringent standards. The project must be consistent with the charitable purposes allowed by the Internal Revenue Service, must have a reasonable budget, must be adequately funded, must be staffed by competent, well-trained personnel, and must be capable of effective monitoring and supervision by NFI. NFI does permit its donors the privilege of earmarking a contribution for a particular project or charitable use. NFI will generally honor a donor's request as long as the request complies with the requirements of the Internal Revenue Code and the contribution is freely available to and in consonance with § 501(c)(3) charitable purposes. Defendant has concluded without basis in the record that under such an arrangement, NFI holds only bare legal title to contributions, while the donors retain control over the funds. Thus, defendant erroneously believes NFI acts only as a "conduit" for its donors and is merely a "device for circumventing the authority and responsibility of the Commissioner of Internal Revenue."

NFI does not act as a "conduit" for its donors. A conduit function assumes that the donor maintains control over the donation. The record is replete with convincing evidence that donors relinquish all ownership and custody of the donated funds or property. NFI executes with its donors a standard form of agreement which provides that NFI has control of all donations. NFI is free to accept or reject any suggestion or request made by a donor. However, in accepting a donor's recommendation, NFI is bound by its articles of incorporation which prohibit NFI from applying any funds toward a non-exempt purpose. In addition, once NFI accepts a donation, the donor has no legal recourse against NFI for the return of the contribution should NFI refuse to honor the donor's request. The Court is convinced that NFI exercises full control over the donated funds and exercises independent discretion as to the charitable disbursement of the funds.

Defendant's portrayal of NFI as a "federation of individual clients serviced by a central organization" which would "substitute the judgment and standards of its own officials for those of the Commissioner and Congress in determining what activities and organizations are exempt" is unpersuasive. Defendant contends that by virtue of NFI's administrative costs of up to 2½ per cent of each donation, NFI is nothing more than an aggregate of separate organizations. In advancing this argument, defendant in essence naively states that it is "unaware of any other charitable organization" which incurs administrative and fundraising costs as a percentage of the contributions that the organization generates. Few, if any, charitable organizations can claim that 100 per cent of each donation reaches the charitable objective, for every organization bears some operating expense. For the defendant to represent otherwise is illogical and unreasonable. The record is again clear that NFI is a unitary organization which does not assess a "fee" on each donation. NFI simply does not intend to diminish the amount of any contribution available for the intended charitable project or activity by more than 2½ per cent.

Defendant also objects to the number of charitable activities in which NFI is involved, and seems to suggest that NFI must seek an IRS determination for each project NFI undertakes. The thrust of defendant's argument is that if NFI is granted tax-exempt status, nothing will prevent it from engaging in non-exempt activities. However, as a unitary organization, NFI's power is defined by its articles of incorporation. Those articles restrict NFI to operating exclusively for § 501(c)(3) purposes. The Court must accept this fact in the administrative record to be true. *Church of the Visible Intelligence that Governs the Universe v. United States, supra* at 60. Even if NFI made disbursements to non-exempt organizations, NFI would not necessarily lose its tax-exempt status. The Internal Revenue Service has ruled that an organization does not jeopardize its exemption under § 501(c)(3), even though it distributes funds to non-exempt organizations, provided the organization retains control and discretion over use of the funds for § 501(c)(3) purposes. Rev.Rul. 68–489, 1968–2 C.B. 210. The Court believes the record speaks for itself that NFI controls every disbursement and ensures that the disbursement is applied to exempt purposes. Thus, NFI comes within the ambit of Revenue Ruling 68–489.

Defendant's assertion that NFI serves private interests by permitting donors to circumvent § 170 and § 501(c)(3) is without any reference to the record, proof, example or substantiation. However, NFI has demonstrated conclusively that its activities provide a broad public benefit.

NFI's methods of operating may be somewhat unique and innovative, but by its approach, NFI offers another way to harness both the sensitivity to local community needs and the charitable creativity of public-minded citizens throughout the country. NFI's goal is to create an effective national network to respond to many worthy charitable needs at the local level which in many cases might go unmet. By drawing upon this grass roots network of re-

sources, creativity, and knowledge of local needs, NFI initiates, funds, and administers many small local charitable projects which would otherwise not be supported. NFI's activities promote public policy and represent the very essence of charitable benevolence as envisioned by Congress in enacting § 501(c)(3). NFI in purpose and effect has met the President's Executive Order to the charitable sector to fill the gaps as government services are withdrawn or trimmed. Exec.Order No. 12,329, 3 C.F.R. 187 (1982). NFI truly functions in the "spirit of charity." Thus, the Court finds that NFI is operated exclusively for exempt purposes.

■ The remaining issue is whether any part of NFI's net earnings has inured to the benefit of any private shareholder or individual.

NFI argues the anti-inurement language in § 501(c)(3) contemplates an influential "insider" relationship rather than an "arm's length" one between the organization and the private shareholder or individual such as an officer, director, or key employee. See, *The Founding Church of Scientology v. United States*, 188 Ct.Cl. 490, 412 F.2d 1197 (1969); *Lowry Hospital Association v. Commissioner*, 66 T.C. 850 (1976). Further, NFI argues that no prohibited insider relationship is created by payment of reasonable salaries to officers, directors, employees, and others as compensation for services rendered to an organization. *Mabee Petroleum Corporation v. United States*, 203 F.2d 872 (5th Cir. 1953). Defendant does not contest the salaries paid to NFI's officers, directors, or employees. Rather, defendant objects to the manner in which NFI compensates its fundraisers.

NFI's fundraising mechanism involves the payment to the Charitable Development Officer (CDO) of $50 of each application fee and of an agreed upon percentage of the contributed amount obtained from the donor ranging from three per cent to six per cent. Often such percentages are reduced or waived as a result of negotiations between NFI and the CDO. In NFI's first full year of operations, the commissions collectively paid to the CDOs amounted to approximately 3.2 per cent of the total donations received. AR 313. The CDO's commission is paid as a fundraising expense before there is a determination of net income. Thus, the CDOs do not participate in the net income of NFI. In addition, no part of CDO commissions is received by any officer, director, or employee of NFI.

Defendant argues that the CDOs are co-venturers with NFI and that the compensation arrangement, which is "entirely and necessarily divorced from any connection to the effort of the [CDO]," results in inurement to private shareholders. The defendant's charge that the CDOs are co-venturers is without merit. The CDOs are in no capacity the "agents" of NFI. The arrangement between the CDO and NFI is strictly on an independent contractor basis. Thus, the Court need only decide if the use of a commission system in which the independent contractor receives a nominal flat fee plus a small percentage of the total donations generated is reasonable.

■ Despite defendant's suggestion to the contrary, there is nothing insidious or evil about a commission-based compensation system. Indeed, "such arrangements are a part of business life and must occasionally be paid by a charity to salesmen, publishers, support groups, and even fund raisers." *People of God Community v. Commissioner*, 75 T.C. 127, 133 (1980). "Commissions are a fundraising incentive well suited to the budget of a fledgling organization." *World Family Corp. v. Commissioner*, 81 T.C. 958, 970 (1983). Therefore, the existence of a contingent compensation arrangement does not preclude tax-exempt status if the arrangement is reasonable. This Court finds that a commission of no more than six per cent is reasonable.

Even if the CDOs were not independent contractors, the Court would still find that the commission system which NFI uses is reasonable based on *People of God Community v. Commissioner, supra,* and *World Family Corp. v. Commissioner, supra.* In *People of God Community,* the

Tax Court denied tax-exempt status to an organization whose controlling member received compensation based upon a percentage of the organization's gross receipts. This percentage, however, was not subject to an upper limit. The Tax Court considered *People of God Community* in *World Family Corporation* when it granted tax-exempt status to an organization whose president received a contingent fee of 10 per cent. The organization was authorized to pay a commission of no more than 20 per cent. Since NFI limits its contingent fee to no more than six per cent, NFI's contingent fee arrangement is reasonable under the reasoning of *People of God Community* and *World Family*.

*Other Issues*

Although defendant's brief raises only two principal justifications for withholding tax-exempt status which have been discussed above, the defendant at various times has raised other issues which the Court believes need discussion and clarification.

■■■ 1. It is much too late for defendant to raise on its reply brief the issue that plaintiff's application "does not show how plaintiff will operate in furtherance of its exempt purpose to make distribution to § 501(c)(3) organizations."[1] Defendant contends that plaintiff's statement on its application for exemption is manifestly insufficient to apprise the Service or to demonstrate the existence of the activities and operations that merit recognition under § 501(c)(3). Yet, defendant never questioned NFI's statement nor asked for further information during the administrative process. The voluminous record indicates that NFI neither refused to answer any question propounded by the IRS nor merely restated an answer when asked for additional information by the IRS. There is no reason to believe that NFI would not have willingly supplemented the statement the defendant now attacks. In any event, the Court does find on the basis of the record that plaintiff has sufficiently met the de-

fendant's objection. NFI plans to conduct a direct-mail fundraising campaign once it is granted tax-exempt status. Defendant believes such proposed operations "rather puts the cart before the horse." However, this Court does not agree with defendant's view, but affirms Congress' approach in allowing an organization to obtain a declaratory judgment based upon proposed activities before substantial time and resources have been committed toward actual operations. *Dumaine Farms v. Commissioner, supra* at 665. Based on the entire administrative record, the plaintiff has sufficiently described its activities to have enabled defendant to rule favorably on its application for exempt status. *Id.*

■■ 2. Defendant contended in administrative proceedings that if NFI is a tax-exempt organization, it should be treated as a "private foundation." (26 U.S.C. § 509) NFI is in no sense a "private foundation" as defined in § 509 of the Code. The Record shows that NFI is not a "private charity" because it qualifies as a publicly supported organization within the meaning of § 170(b)(1)(A)(vi) and § 509(a)(1) of the Code. At least one-third of NFI's total support comes from gifts from the general public (approximately 70 per cent in 1984) and not more than one-third of total support comes from investment income.

■■ 3. Defendant has contended that NFI failed to exhaust its administrative remedies. The Record, to the contrary, shows that NFI has taken every step required of it to obtain a ruling on its application. It supplied revised documentation and additional information whenever requested by the IRS. It met every regulatory requirement imposed by the IRS to obtain a ruling. After the last meeting with the IRS on January 15, 1985, NFI had no other course open to it except to file this action. It would be difficult to conceive of any stronger evidence of exhaustion of administrative remedies than is contained in the Record in this action. The delay which NFI has encountered in obtaining a final

---

1. There is ample precedent for this Court to refuse to consider this issue at all. *Dumaine*

*Farms v. Commissioner, supra* at 671.

decision on its status has endangered its existence because the success of its fund-raising efforts is directly dependent upon its donors being allowed a tax deduction for gifts to NFI as a recognized tax-exempt charity. In the Court's view the delay in handling NFI's application by the Service (and unfortunately to some extent by this Court also) represent the antithesis of good government. Due to the delay the Court set this matter for a status conference on September 18, 1987, and took the unusual step of announcing to counsel for the parties at that conference what the Court's determination on the merits would be regarding NFI's status so that NFI might advise its supporters of this Court's favorable decision and perhaps thereby keep from losing their support pending the issuance of a final order either by this Court or an appellate Court.

*Conclusion*

■ For the foregoing reasons and on the Record presented to it, the Court finds that NFI is an organization that is organized and operated exclusively for exempt purposes within the meaning of § 501(c)(3) of the Internal Revenue Code and that no improper or illegal inurement of private gain has occurred in contravention of any law or applicable rule or regulation. Further, because of its broad base of support and limited investment income, NFI qualifies as a publicly supported organization within the meaning of § 509 of the Code. Finally, the Court finds that NFI, after exhaustion of its administrative remedies, is entitled to a declaratory judgment that it is an exempt organization under § 501(c)(3) of the Code. However, should NFI deviate from operating as a § 501(c)(3) organization, the IRS will, of course, be free to revoke its recognition of tax-exempt status. *Church of the Visible Intelligence that Governs the Universe v. U.S., supra* at 63, *citing Western Catholic Church v. Commissioner,* 73 T.C. 196 (1979).

IT IS SO ORDERED.